IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATIE GEYER, | : |
| Plaintiff | : |
| v. | : DOCKET NO: |
| CUMBERLAND COUNTY, JESSE PALMER | : |
| Defendants | : Jury Trial Demanded |

## COMPLAINT

NOW COMES, Plaintiff, Katie Geyer, by and through her counsel, Peggy M. Morcom, Esquire, and Buzgon Davis Law Offices, and hereby files this Complaint alleging gender discrimination, harassment, hostile work environment and retaliation, arising out of her employment with Cumberland County, and avers as follows:

## NATURE OF ACTION

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000(e), *et seq.* (Title VII); The Pennsylvania Human Relations Act, 43 P.S. §§651-963 (PHRA); and retaliation.

2. Jurisdiction is appropriate in this Court under 28 U.S.C. §§ 1331, 1343, and 1367.

1

3. Venue is proper because all parties reside or do business in this District, and all unlawful employment practices complained of occurred in this District.

4. On November 28, 2016, Plaintiff filed a Complaint with the Pennsylvania Human Relations Commission, which was dually filed with Equal Employment Opportunity Commission, and exhausted her administrative remedies.

## PARTIES

5. Plaintiff, Katie Geyer, is an adult individual residing in Carlisle, Cumberland County, Pennsylvania.

6. Defendant, Cumberland County (County), located at 1 Courthouse Square, Carlisle, PA 17013, is a municipal body organized under the Pennsylvania County Code governed by a Board of Commissioners who are responsible for implementing the County's budget and administration of County programs, personnel, property and facilities.

7. Defendant, Jesse Palmer, was employed as a Corporal at Cumberland County Prison, and he was Ms. Geyer's Supervisor. (Palmer)

8. The County employs four or more employees in the current or preceding calendar year.

9. On December 14, 2015, Ms. Geyer was hired by the County as a Corrections Officer (CO) at the Cumberland County Prison, 1101 Claremont Road, Carlisle, PA 17015.

10. Ms. Geyer was also supervised by Lieutenant Rick Keeseman (Keeseman).

11. Ms. Geyer's employment with the County ended on June 1, 2016.

## COUNT 1
## GENDER DISCRIMINATION, HARASSMENT AND HOSTILE WORK ENVIRONMENT – TITLE VII OF THE CIVIL RIGHTS ACT

12. Ms. Geyer incorporates Paragraphs 1 through 11, as though fully set forth herein.

13. Ms. Geyer is a female.

14. The County is an employer as defined by Title VII.

15. Ms. Geyer was qualified for the position of Corrections Officer. She holds a Bachelor of Science Degree in Criminal Justice. Prior to beginning her employment with Cumberland County, she was employed as a Corrections Officer with Franklin County Prison for the period October 2014 through December 2015.

16. In March of 2016, Complainant contacted Mike Burkett, Manager, and verbally complained regarding the ongoing behaviors of Palmer, which she considered to be discriminatory and harassing, based on her gender, with such behaviors creating a hostile work environment. Specifically, she complained of the following:

3

a. Ms. Geyer completed the unit count without using a clipboard. She acted in the same manner as male Correction Officers when conducting unit count. Palmer called Ms. Geyer into "the Bubble" and began yelling at her for not using a clipboard. He stated the following: "That's not how they (Cumberland County Prison) do things. How stupid are you to not walk around with a clip board? I would never hire anyone with past experience." He then proceed to explain what he believed was the proper procedure, and when Ms. Geyer advised that she was conforming to his instructions, he stated "Tough shit, hot shit, I told you to walk with the board. That's what you must do." Ms. Geyer asked for a copy of the policy or Standard Operating Procedure, to which Palmer responded, "F*** you Geyer, just do it and respect authority." No Standard Operating Procedure existed contrary to Ms. Geyer's actions.

b. Palmer accused Ms. Geyer of conducting ineffective strip searches of female inmates. Despite her strip searches being appropriate, Palmer yelled at her, "What the f*** is wrong with you," and claimed her searches were too short in duration. He advised that he would continue to time her, but did not provide a period of time for which a strip search should be completed. Male Correction Officers were not timed. No

4

Standard Operating Procedure or Policy existed setting forth the time required to conduct an appropriate strip search;

c. Palmer repeatedly asked Ms. Geyer what the "f***" is the matter with you", repeatedly used the f-word toward her, made statements to her that she was a "f***ing screw-up", that she was "f***ing retarded", that she was a "poor excuse for a corrections officer," and if he "were administration he would never hire people with experience because they think they know everything."

d. Palmer also repeatedly referred to Ms. Geyer as an "idiot" and "piece of shit." Palmer also told her that she should "just kill herself."

e. Palmer made some of these statements in the presence of inmates which diminished Ms. Geyer's authority and impacted her safety, safety of other employees, and the safety of inmates.

f. Palmer advised Ms. Geyer (in the presence of Kesseman) that he was constantly watching her on videotapes. Ms. Geyer requested union representation, which was denied by both Kesseman and Palmer. Palmer threatened Ms. Geyer with discipline.

17. Ms. Geyer also reported these complaints to Kesseman, who advised her to "just be quiet and do what you're told."

18. Palmer's behaviors towards Ms. Geyer were regular, occurring on most shifts.

19. Male Correction Officers were treated more favorably than Ms. Geyer and not subjected to the same behaviors by Palmer.

20. Ms. Geyer also approached Palmer regarding her concerns related to his behavior, to which he responded he thought they could "work something out." However, Palmer's behavior continued to escalate, and in or about April 2016, Ms. Geyer having heard nothing from Human Resources in response to her Complaint, contacted Warden Earl F. Reitz, Jr., who did not respond to her complaints, he merely forwarded them to Human Resources.

21. In May of 2016, Ms. Geyer was contacted by Melinda Thompson, Human Resources Analyst/Employee and Labor Relations (Thompson), who scheduled a meeting with her, Deputy Warden Jeffrey Ilgenfritz and Warden Reitz. Thompson unexpectedly canceled the meeting. The meeting was rescheduled for May 11, 2016 at 7:30 a.m., and the only individuals present were Thompson and Ms. Geyer.

22. At the beginning of the May 11, 2016 meeting, Thompson informed Ms. Geyer that she received information on her desk that morning regarding Ms. Geyer's performance. Ms. Geyer requested a union representative, and Thompson

6

denied her request. Thompson did not provide any information or specifics to Geyer regarding alleged performance issues.

23. During the May 11, 2016 meeting, Ms. Geyer requested a summary of the performance issues, for which Thompson could not respond or refused to respond.

24. During the May 11, 2016 meeting, Ms. Geyer reiterated her complaints set forth in Paragraph 16 above. Ms. Geyer inquired as to when she would learn the outcome of an investigation, to which Thompson responded that it was none of her business.

25. Ms. Geyer was never disciplined during her employment.

26. Since the harassment was ongoing by Palmer, despite complaints to various levels of management, including Human Resources, and through the chain of command, Ms. Geyer resigned her employment effective at the conclusion of her May 31, 2016 shift (7:00 a.m. on June 1, 2016), providing a two week notice. During the two week notice period, no information regarding her complaints or alleged performance issue was provided to Geyer, nor contact made by Human Resources regarding alleged performance issues or the status of Ms. Geyer's complaints.

27. Ms. Geyer reported to her last shift on May 31, 2016 beginning at 11:00 p.m. and ending at 7:00 a.m. on June 1, 2016. During that shift, Ms. Geyer

responsibilities were again directed by Palmer. Ms. Geyer was assigned to a male unit. She was never previously assigned to a male unit. Palmer advised her not to perform any tasks during her shift including, but not limited to, answering the telephone, completing paperwork or conducting count. Palmer stripped Ms. Geyer of her responsibilities for the last eight (8) hours of her employment with the County.

28. At the conclusion of her last shift, Ms. Geyer proceeded to her locker to retrieve her personal items, including tennis shoes, eye glasses, and her written statements to Human Resources. She was unable to access her locker because the lock had been changed during her shift. She contacted Keeseman, who stated "TS"[1] and Keeseman advised her that she should have gathered her personal items prior to the beginning of her shift. Ms. Geyer's items were never returned to her.

29. Ms. Geyer reported the events surrounding her locker to Thompson with Human Resources, who responded Human Resources did not want to get involved.

30. Male Correction Officers, who resigned employment, were able to gather their personal belongings.

31. Male Correction Officers, who resigned employment, did not experience their personal items being destroyed.

---

[1] TS is known to mean "tough shit."

8

32. Ms. Geyer also reported her concerns of harassment by Palmer to a union representative. However, since Ms. Geyer was under six months of employment, she was not eligible for union protection, ie. grievance process, under the Collective Bargaining Agreement. The union advised her to report her complaints to Human Resources.

33. As a result of the harassing behavior of Palmer and lack of action by Human Resources, the Warden, Deputy Warden, or Keeseman, Ms. Geyer believed she had no other recourse but to resign her employment.

34. Following her resignation, Thompson sent correspondence to Ms. Geyer indicating her eligibility for rehire was diminished because she resigned while an investigation concerning performance was pending.

35. Upon receipt of the letter from Thompson, Ms. Geyer contacted her via telephone and requested clarification as to the contents of the letter. Thompson indicated that Ms. Geyer was not eligible for future hire in any capacity/position for Cumberland County because she resigned during an active investigation into her performance.

36. Thompson admitted at Ms. Geyer's unemployment hearing that the actions of Palmer were inappropriate.

37. The County, through Human Resources, failed to conduct an investigation into Ms. Geyer's complaints.

38. As a direct and proximate result of the above described actions, Ms. Geyer suffered financial injury, including but not limited to future loss of earnings, loss of earning potential, loss of benefits, loss of pension and retirement benefits.

39. As a direct and proximate result of the above described actions, Ms. Geyer suffers from emotional and mental injuries, including, but not limited to, past and present pain and suffering, humiliation, and anxiety. Ms. Geyer sought medical treatment during her employment, and she was placed on anxiety medication.

40. As a direct and proximate result of the above described conduct, Ms. Geyer suffered professional injuries including, but not limited to, her professional reputation, professional development and loss of potential promotions, loss of pension and retirement benefits.

## COUNT 2
## VIOLATIONS OF THE PENNSYLVANIA HUMAN RELATIONS ACT
## 43 P.S. §951, *et seq.*

41. Paragraphs 1 through 40 of the Complaint are incorporated by reference as though fully set forth herein.

42. Ms. Geyer was an employee of Cumberland County as the term is defined by the PHRA.

43. The County employees four or more persons within the Commonwealth of Pennsylvania and falls within the reach of the PHRA.

44. The actions of the County and Palmer enumerated above are in violation of the PHRA.

45. As a direct and proximate result of the above described conduct, Ms. Geyer suffered emotional and mental injuries including, but not limited to, past and present pain, humiliation, depression and anxiety.

46. As a direct and proximate result of the above described conduct, Ms. Geyer suffered professional injuries including, but not limited to, her professional reputation, professional development, loss of potential promotions, and loss of pension and retirement benefits.

47. As a direct and proximate result of the above described actions, Ms. Geyer suffered the loss of future earnings, loss of earning potential, loss of benefits, loss of pension and retirement benefits.

## COUNT 3
## **RETALIATION**

48. Paragraphs 1 through 47 are incorporated by reference as though fully set forth herein.

49. Palmer, Keeseman, the Warden, Deputy Warden, and Human Resources were aware of Ms. Geyer's complaints of discrimination, harassment, and hostile work environment.

50. The actions of Palmer as described above were a willful course of conduct which continued and escalated after her initial complaint.

11

51. Palmer's actions to strip Ms. Geyer of her responsibilities during her final shift on May 31, 2017 was intentional and as a result of her Complaints to Human Resources.

52. Palmer's actions to allege poor performance of Ms. Geyer to Human Resources and others, after she complained of his behaviors, was an act of intimidation and intentional as a result of Ms. Geyer's Complaints.

53. Thompson's relay of alleged performance issues, without disclosing the nature of Ms. Geyer's performance issues, was an act of intimidation as a result of Ms. Geyer's Complaints to Human Resources.

54. The removal of Ms. Geyer's personal items from her locker during her final shift and discarding such items was intentional and as a result of her Complaints to Human Resources and others.

55. The conduct of Defendants was egregious, intentional and outrageous.

56. The actions of Palmer were supported by the County and its administrative employees, as they failed to take timely and appropriate action.

57. Defendants failed to comply with internal policies and procedures regarding internal complaints, discriminatory harassment, and hostile work environment.

58. As a direct and proximate result of the above described conduct, Ms. Geyer suffered emotional and mental injuries including, but not limited to, past and present pain, humiliation, depression and anxiety.

59. As a direct and proximate result of the above described conduct, Ms. Geyer suffered professional injuries including, but not limited to, her professional reputation, professional development, loss of potential promotions, and loss of pension and retirement benefits.

60. As a direct and proximate result of the above described actions, Ms. Geyer suffered the loss of future earnings, loss of earning potential, loss of benefits, loss of pension and retirement benefits.

## **REQUEST AND RELIEF**

WHEREFORE, Plaintiff, Katie Geyer, respectfully requests this Honorable Court to grant judgment in her favor and against Defendants for damages in an amount in excess of $75,000 plus interest and cost of suit, as well as the following:

a. Exercise jurisdiction over this matter;

b. Order Defendants to reimburse Plaintiff for all salary and benefits lost as a result of Defendants actions, in an amount in excess of $75,000, including but not limited to front pay, back pay, and compensatory damages;

c. Award Plaintiff an amount in excess of $25,000 for loss of retirement and pension benefits;

d. Award Plaintiff punitive damages;

e. Award Plaintiff all costs of this action, including reasonable attorneys fees incurred by Plaintiff; and

f. Award Plaintiff such other and full relief as this Court deems just, proper and equitable.

Respectfully submitted,

_____
Peggy M. Morcom, Esquire
Attorney ID: 92463
Buzgon Davis Law Offices
525 South 8th Street
Lebanon, PA 17042
Morcom@buzgondavis.com
(717) 274-1421
Counsel for Complainant

Date: _____1/11/18_____

## VERIFICATION

The undersigned hereby verifies that the statements in the foregoing document are based upon information which has been furnished to counsel by me and information which has been gathered by counsel in the pursuit of this lawsuit. The language of the foregoing document is that of counsel and not my own. I have read the foregoing document and to the extent that it is based upon information which I have given to counsel, it is true and correct to the best of my knowledge, information and belief. To the extent that the contents of the foregoing document are that of counsel, I have relied upon my counsel in making this verification. The undersigned also understands that the statements therein are made subject to the penalties of 18 Pa. C.S. §4904 relating to unsworn falsification to authorities.

Date: 12/8/2017

Katie Geyer